IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

MICHAEL W. MORRISON,                )
                                    )
                Plaintiff,          )
                                    )
        v.                          )       Case No.
                                    )       11-3494-CV-S-REL-SSA
CAROLYN W. COLVIN, Acting           )
Commissioner of Social Security,    )
                                    )
                Defendant.          )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Michael Morrison seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Titles II and XVI of

the Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in (1) finding plaintiff

not credible, (2) discrediting two opinions, and (3) relying on defective vocational expert

testimony.  I find that the substantial evidence in the record as a whole supports the ALJ's

finding that plaintiff's is not disabled.  Therefore, plaintiff's motion for summary judgment

will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On May 15, 2009, plaintiff applied for disability benefits alleging that he had been

disabled since November 14, 2005.[1]  Plaintiff's disability stems from back problems knee

problems, bipolar disorder, depression, and attention deficit hyperactivity disorder.  Plaintiff's

application was denied on August 6, 2009.  On May 5, 2011, a hearing was held before an

Administrative Law Judge.  On June 24, 2011, the ALJ found that plaintiff was not under a

---

[1]Plaintiff filed a previous application on March 15, 2007, alleging disability beginning
November 14, 2005 -- the same alleged onset date as in the present case.  The ALJ found
plaintiff not disabled from March 15, 2007, through May 13, 2009.  Two days later, plaintiff
filed the instant application for benefits.  Absent a colorable constitutional claim, a previous
decision of the Commissioner is not subject to judicial review.  Davis v. Sullivan, 977 F.2d
419, 420 (8th Cir. 1992); Brown v. Sullivan, 932 F.2d 1243, 1245-246 (8th Cir. 1991),
citing Califano v. Sanders, 430 U.S. 99, 107-109 (1977).

"disability" as defined in the Act. On October 14, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

2

### III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

3

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert #, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1975 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1975 | $   196.50 | 1993 | $  9,326.38 |
| 1976 | 2,546.66 | 1994 | 12,980.50 |
| 1977 | 3,164.70 | 1995 | 14,006.43 |
| 1978 | 1,832.39 | 1996 | 16,519.04 |
| 1979 | 918.06 | 1997 | 8,621.90 |
| 1980 | 461.40 | 1998 | 13,077.75 |
| 1981 | 0.00 | 1999 | 19,711.50 |
| 1982 | 1,893.58 | 2000 | 28,094.38 |
| 1983 | 5,114.71 | 2001 | 35,979.06 |
| 1984 | 462.00 | 2002 | 20,492.79 |
| 1985 | 1,787.92 | 2003 | 16,396.07 |
| 1986 | 4,186.50 | 2004 | 13,839.37 |
| 1987 | 2,367.20 | 2005 | 14,959.50 |
| 1988 | 3,450.76 | 2006 | 104.00 |
| 1989 | 8,773.03 | 2007 | 0.00 |
| 1990 | 5,978.22 | 2008 | 0.00 |
| 1991 | 4,735.66 | 2009 | 0.00 |
| 1992 | 3,733.29 | 2010 | 0.00 |

(Tr. at 193).

### Disability Report

In a Disability Report plaintiff reported that he can read and understand English, and when asked whether he could "write more than your name in English" he answered, "Yes"

4

(Tr. at 196).  Plaintiff reported that he worked for a few days in 2006 as a telemarketer but had to quit because he could not follow the directions (Tr. at 197).

**Function Report**

On May 25, 2009, plaintiff completed a Function Report (Tr. at 221-228).  Plaintiff reported that he stays in bed all day except to eat and use the bathroom.  Plaintiff cannot bend to dress himself, he cannot hold his arms up for long to care for his hair or shave, he cannot sit long enough to feed himself, and he has difficulty using the toilet because his tail bone and leg tingle.  He needs reminders to take care of personal needs and grooming and to take his medication.  He does no housework and no yard work, he does very little cooking.

When he goes out, he rides in a car.  He can go out alone.  He drives "very little."  He shops in stores for food.  He is not able to pay bills, handle a bank account, count change, or use a checkbook or money orders.  He said he has never been able to do these things because he "can't count."  His ability to handle money has not changed since his condition -- "never have been able to, to begin with."  He used to fish, but now he "can't even hold a fishing pole."  When asked whether he has problems getting along with others, plaintiff wrote, "I am very mad, and mad at the world. All I wanted was help with my back and Pam and the system just blew me off.  I real sad.  I don't want nothing to do with anyone!"

Plaintiff's condition affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, use his hands, and get along with others.  When asked how far he can walk, he wrote, "It's different each time. But it really sucks, can't walk or do normal things."   He cannot pay attention for long.  He does not follow written instructions at all.  He makes his own instructions.  He cannot follow spoken instructions "at all!"  When asked how well he gets along with authority figures, plaintiff wrote, "Not at all.  Best to keep them away from me."  When asked if he had

5

ever lost a job because of problems getting along with others, he checked, "yes" and wrote, "Told me what to do, I told them to go to hell". He does not handle stress at all, he does not like changes in routine. When asked if he had noticed any unusual behavior or fears, plaintiff checked, "yes" and wrote, "What will happen to me or others because of my anger".

When asked for any additional remarks, plaintiff wrote:

> It seems this whole time I go threw this no one gave a shit. Its just paper work paper work. I am so dam mad. I lost my wife and wonderful little daughter, all I wanted was help. And not live with this kind of pain each day. No one needs this. I have no life now. And don't want to live like this. It really hurt when I found out I could not do the work I have always done concrete work and found out that my little girl in 3rd grade new more than me when it came to school work, I can't even help her.

**B.   SUMMARY OF MEDICAL RECORDS**

Plaintiff's alleged onset date is November 14, 2005.

On April 10, 2006, nearly five months after plaintiff's alleged onset of disability, Shane Bennoch, M.D., of Missouri Independent Medical Evaluations in Springfield, Missouri, performed a consultative medical examination of plaintiff pursuant to a worker's compensation claim (Tr. at 623-645). Plaintiff told Dr. Bennoch he injured his back on November 14, 2005, when pouring concrete on a job site (Tr. at 626). The day after the injury, he went to the emergency room for treatment (Tr. at 627). Plaintiff reported several previous worker's compensation injuries, but no prior medical admissions or surgeries (Tr. at 630-632). After examining plaintiff and reviewing medical records, Dr. Bennoch completed a Medical Source Statement ("MSS") form, finding that plaintiff could occasionally lift and carry less than 10 pounds and could walk and stand less than two hours in an eight-hour workday (Tr. at 642). He had limited ability to push and pull and could occasionally climb stairs, kneel, crouch, and stoop, but never climb ropes, ladders, or scaffolds, balance, or crawl (Tr. at 643).

6

On May 3, 2006, in a letter to a lawyer, Dr. Bennoch wrote that it was his "opinion that [plaintiff] has been temporarily totally disabled since the injury that occurred in November 2005" (Tr. at 622).

On September 29, 2006, Michael Whetstone, Ph.D., of NeuroPsychology Resources in Springfield, Missouri, examined plaintiff pursuant to his worker's compensation claim (Tr. at 651-655). Dr. Whetsone noted that plaintiff was somewhat slow in moving, but was able to ambulate without any apparent distress (Tr. at 653). Plaintiff reported a history of criminal activity, including burglaries, bar fights, and such, and said he had been incarcerated several times, but had been "saved" at a Christian church the previous March and changed his behavior (Tr. at 653). He denied any current symptoms of depression or anxiety and denied any formal diagnosis or medical treatment for a mental impairment (Tr. at 653-654). Plaintiff said he spent his days reading the Bible, running back and forth taking care of his wife and daughter, and trying to vacuum and clean rather than watching television (Tr. at 654). He enjoyed hunting and fishing and played drums in a local band at his church (Tr. at 654).

Dr. Whetstone administered the Minnesota Multiphasic Personality Inventory ("MMPI-2"), and found that test results showed a "fake good" profile, reflecting a significant element of conversion symptomology (Tr. at 655). Plaintiff's responses suggested that he used somatic physical complaints to avoid responsibility, deny psychological problems, or control or manipulate others (Tr. at 655). Dr. Whetstone diagnosed lumbar back pain, possible

7

somatoform disorder,[2] and characteristics of histrionic,[3] antisocial,[4] and narcissistic[5] personality (Tr. at 655).  He noted that plaintiff's MMPI profile "suggests a strong underlying psychologic influence, including "potential secondary gain issues" (Tr. at 655).  Dr. Whetstone strongly encouraged conservative, consistent medical treatment with an emphasis on exercise, strengthening programs, and nonaddictive pain medication (Tr. at 655).

On April 14, 2007, plaintiff saw physiatrist Ted Lennard, M.D., of the Springfield Neurological and Spine Institute in Springfield, Missouri (Tr. at 647).  Dr. Lennard diagnosed L4-5 and L5-S1 disc bulges and somatoform disorder and found that plaintiff had a 10 percent permanent partial impairment (Tr. at 647).  He recommended that plaintiff perform home exercise, lose weight, and quit smoking (Tr. at 647).  He limited plaintiff to lifting no more than 40 pounds and only occasional bending (Tr. at 647).

On July 10, 2007, plaintiff saw Paul Olive, M.D., at Orthopaedic Specialists of Springfield in Springfield, Missouri, for an independent medical examination in his worker's

---

[2]Somatoform disorders are mental illnesses that cause bodily symptoms, including pain. The symptoms cannot be traced back to any physical cause and they are not the result of substance abuse or another mental illness.

[3]People with histrionic personality disorder have intense, unstable emotions and distorted self-images.  For people with histrionic personality disorder, their self-esteem depends on the approval of others and does not arise from a true feeling of self-worth.  They have an overwhelming desire to be noticed and often behave dramatically or inappropriately to get attention.

[4]Antisocial personality disorder is a type of chronic mental illness in which a person's ways of thinking, perceiving situations and relating to others are abnormal and destructive.  People with antisocial personality disorder typically have no regard for right and wrong.  They may often violate the law and the rights of others, landing in frequent trouble or conflict.  They may lie, behave violently, and have drug and alcohol problems.

[5]Narcissistic personality disorder is a mental disorder in which people have an inflated sense of their own importance and a deep need for admiration.  Those with narcissistic personality disorder believe that they are superior to others and have little regard for other people's feelings.  But behind this mask of ultra-confidence lies a fragile self-esteem, vulnerable to the slightest criticism.

compensation case (Tr. at 658-661).  After examining plaintiff and reviewing medical records, Dr. Olive found that plaintiff's November 2005 work injury exacerbated his chronic back pain, resulting in a partial permanent impairment of five percent (Tr. at 658).  Dr. Olive thought plaintiff would not require further medical treatment as the result of the injury and could perform work at the medium exertional level (Tr. at 658).

On April 16, 2008, Craig Shifrin, Psy.D., of Springfield, Missouri, examined plaintiff at the request of a state agency (Tr. at 736).  Plaintiff said he was angry because his wife had left him (Tr. at 735).  He reported a history of multiple DWIs and periods of incarceration, including four years in prison (Tr. at 736).  Dr. Shifrin determined plaintiff had no long-term mental disorders that would interfere with ability to work, nor was he mentally disabled or impaired (Tr. at 736).  The doctor diagnosed ADHD, alcohol dependency in full remission, and possible bipolar disorder, and assigned a global assessment of functioning ("GAF") score of 52[6] (Tr. at 736).

On May 26, 2008, Charles Maudlin, M.D., of Concentra Medical Centers in Springfield, Missouri, examined plaintiff at the request of a state agency to determine plaintiff's eligibility for benefits (Tr. at 416-418).  Plaintiff complained of severe pain in his low back and knees after a work-related injury in 2005 (Tr. at 417).  Dr. Maudlin noted that plaintiff's self-reported complaints were consistent with being bedridden or "embellishment" (Tr. at 418).  Dr. Maudlin found "no evidence of a condition" that would limit plaintiff's employability (Tr. at 418).

On July 15, 2008, occupational medical specialist David Paff, M.D., examined plaintiff at the request of the state Disability Determination Services ("DDS") (Tr. at 386).  Plaintiff

---

[6]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

complained of constant low back pain since November 2005, treated with oxycodone (narcotic) and trazodone[7] (Tr. at 385). Plaintiff said he could walk only five minutes and had to use a cane (Tr. at 385). He said he was depressed and cried a lot because he was in the process of divorce and was "losing his wife" (Tr. at 385). Upon physical examination, Dr. Paff observed that plaintiff walked normally, but had moderate tenderness and spasm in his lumbar paraspinals (Tr. at 386). Back x-rays showed mild degenerative disc disease and facet joint arthrosis of the lumbar spine; x-rays of plaintiff's knee were unremarkable (Tr. at 386, 648). Dr. Paff diagnosed degenerative disc disease with right leg radiculopathy, mild hyperlipidemia (high cholesterol), bilateral knee pain, and migraine headaches. He stated that plaintiff "is disabled for a year" (Tr. at 384, 386). Dr. Paff encouraged plaintiff to see his personal physician about his elevated cholesterol and triglycerides (Tr. at 387).

On November 7, 2008, plaintiff saw Jay Baker, D.O., at the Ozarks Community Hospital Pain Clinic in Springfield, Missouri, with complaints of chronic back pain and radiating right leg pain (Tr. at 308-309, 316-317). Dr. Baker started plaintiff on an exercise program, ordered x-rays and magnetic resonance imaging ("MRI") and prescribed methadone[8] (Tr. at 308).

On January 23, 2009, plaintiff saw Dr. Baker again, complaining of ongoing back pain (Tr. at 315, 488). Plaintiff said he was not able to exercise three to four times a day, as he had been instructed to do at the last appointment (Tr. at 315, 488). Plaintiff said methadone

---

[7]An anti-depressant used to treat depression, anxiety, and insomnia.

[8]Methadone is an opioid pain reliever, similar to morphine. An opioid is sometimes called a narcotic. It also reduces withdrawal symptoms in people addicted to heroin or other narcotic drugs without causing the "high" associated with the drug addiction. Methadone is used as a pain reliever and as part of drug addiction detoxification and maintenance programs.

Case 6:11-cv-03494-REL   Document 17   Filed 03/29/13   Page 10 of 49

caused headaches and morphine did not work well (Tr. at 315, 488).  Dr. Baker offered a

Duragesic[9] patch, but plaintiff declined (Tr. at 315, 488).  Dr. Baker refused to provide

OxyContin because of plaintiff's noncompliance, and again recommended an MRI (Tr. at 315,

488).

On April 1, 2009, plaintiff saw William Graham, M.D., at the Jordan Valley

Community Health Center, complaining of stomach pain after eating (Tr. at 454, 456).

Laboratory work was normal (Tr. at 456).  Dr. Graham diagnosed lumbar spondylosis,[10]

migraine headache, and possible bipolar disorder,[11] and he prescribed Prilosec (treats

heartburn) (Tr. at 456).  He told plaintiff he would not prescribe narcotics for chronic pain

(Tr. at 456).

---

[9]The DURAGESIC® (fentanyl transdermal system) CII patch is a strong prescription pain
medication for moderate to severe chronic pain that can provide long-lasting relief from
persistent pain.  Through its patch technology, DURAGESIC® delivers fentanyl, an opioid pain
medication, slowly through the skin and into the body, where it works to relieve pain for up
to 3 days (72 hours).  DURAGESIC® is strong medicine for serious pain. The DURAGESIC®
patch should only be used when other less potent medicines have not been effective and when
pain needs to be controlled around the clock.

[10]Lumbar spondylosis, also called spinal osteoarthritis, is a degenerative condition which
affects the lower spine.  In a patient with lumbar spondylosis, the spine is compromised by a
narrowing of the space between the vertebrae, causing a variety of health problems ranging
from back pain to neurological issues.  This condition is usually caused by old age, as the spine
undergoes changes as people grow older, and many of these changes contribute to
degeneration of the vertebrae.

[11]Bipolar disorder -- sometimes called manic-depressive disorder -- is associated with
mood swings that range from the lows of depression to the highs of mania.  When the patient
become depressed, he may feel sad or hopeless and lose interest or pleasure in most activities.
When his mood shifts in the other direction, he may feel euphoric and full of energy.  Mood
shifts may occur only a few times a year, or as often as several times a day.  In some cases,
bipolar disorder causes symptoms of depression and mania at the same time.  Although bipolar
disorder is a disruptive, long-term condition, the patient can keep his moods in check by
following a treatment plan.  In most cases, bipolar disorder can be controlled with medications
and psychological counseling (psychotherapy).

Case 6:11-cv-03494-REL   Document 17   Filed 03/29/13   Page 11 of 49

On April 9, 2009, plaintiff went to the St. John's Hospital emergency room in Springfield, Missouri, complaining of abdominal pain (Tr. at 341-353). A physical examination and psychiatric assessment were mostly normal (Tr. at 243-244). After an abdominal computed tomography ("CT") scan, plaintiff was diagnosed with uncomplicated sigmoid diverticulitis[12] and instructed to avoid seeds, popcorn, and nuts and have a colonoscopy in the next few months (Tr. at 341, 346-247).

On May 4, 2009, plaintiff returned to the emergency room at St. John's complaining of chest pain and headache (Tr. at 323-340). Upon examination, a clinician found that plaintiff had a normal range of motion, normal muscle tone, normal coordination, normal mood, normal affect, and normal behavior (Tr. at 325, 330). A CT of plaintiff's head was negative (Tr. at 327). Plaintiff was offered a stress test but refused (Tr. at 327). Upon discharge, plaintiff was told to follow up with his primary care doctor (Tr. at 322).

On May 5, 2009, plaintiff saw Dr. Baker and complained of headaches and low back pain (Tr. at 314, 487). He reported that he recently spent 13 hours in the St. John's emergency room, after which they referred him to his primary care provider (Tr. at 314, 487). Dr. Baker explained that he was not a primary care provider and declined to order additional tests as plaintiff requested (Tr. at 314, 487). Dr. Baker referred him to a headache specialist (Tr. at 314, 487). Dr. Baker prescribed methodone, but refused to provide OxyContin or oxycodone (Tr. at 314, 487).

---

[12]Sigmoid diverticulosis is a condition in which small pouches called diverticula form on the wall of the sigmoid colon, which is the part of the large intestine that connects to the rectum. It's typically associated with certain risk factors, including age and a poor diet. Though many people with this disorder have few symptoms, it can cause pain and digestive dysfunction. It is often treatable with medication and lifestyle changes, though severe cases may require surgery.

On May 13, 2009, x-rays of plaintiff's lumbar spine showed no acute fracture or subluxation[13] and very small anterior osteophytes[14] (Tr. at 573). The x-rays suggested possible slight loss of disc height at L5-S1 and mild facet joint arthrosis (Tr. at 373). Nathan Lester, M.D., recommended a follow up MRI (Tr. at 373).

Plaintiff filed his application for disability benefits on May 15, 2009.

On May 23, 3009, plaintiff saw nurse practitioner Gail Hudson, F.N.P., at Ozarks Community Hospital in Springfield, Missouri, to establish care, stating that he needed a new primary care provider as he last saw a primary care doctor in 2005 (Tr. at 366). Plaintiff said he went to the Plasma Center twice a week for two years and they had noted an elevation in his blood pressure, but he did not take any medications for it (Tr. at 366). He said he had not taken any medications he had been prescribed and his main concern was stomach problems (Tr. at 366).

On May 26, 2009, plaintiff saw Ms. Hudson and asked about medication for depression (Tr. at 363). Ms. Hudson noted that plaintiff was not taking prescribed medications, claiming he could not afford some and did not like others (Tr. at 363). X-rays of plaintiff's chest that day were unremarkable (Tr. at 371). X-rays of plaintiff's cervical spine showed moderate degenerative disease at C5-6 (Tr. at 371).

---

[13]In simplest terms, a subluxation (a.k.a. Vertebral Subluxation) is when one or more of the bones of the spine (vertebrae) move out of position and create pressure on, or irritate spinal nerves. Spinal nerves are the nerves that come out from between each of the bones in the spine. This pressure or irritation on the nerves then causes those nerves to malfunction and interfere with the signals traveling over those nerves.

[14]Osteophytes which are protrusions of bone and cartilage are very common and develop in areas of a degenerating joint. They are associated with the most common type of arthritis, osteoarthritis. Osteophytes typically develop as a reparative response by the remaining cartilage.

13

On June 5, 2009, plaintiff contacted Ms. Hudson requesting that she complete more disability paperwork and refill his prescription for Crestor (lowers cholesterol) (Tr. at 361). Ms. Hudson declined to complete the disability form (Tr. at 361).

On June 9, 2009, plaintiff went to the St. John's Hospital emergency room complaining of flank pain (Tr. at 588-589). A CT scan showed a small kidney stone (Tr. at 595). Plaintiff was given Percocet (acetaminophen, or Tylenol, mixed with oxycodone, a narcotic) for pain and Phenergan for nausea (Tr. at 588-589). Plaintiff refused admission for further treatment because the hospital would not allow him to smoke (Tr. at 593-594).

On June 18, 2009, plaintiff saw headache specialist Kenneth Sharlin, M.D., at the Ozarks Community Neurology Clinic, for a neurological consultation upon referral of Dr. Baker (Tr. at 434). Plaintiff complained of daily headaches for as long as he could remember, causing unbearable pain (Tr. at 433). Upon physical examination, Dr. Sharlin noted that plaintiff had a normal gait, station, and stride (Tr. at 434). Dr. Sharlin thought that plaintiff might be having rebound headaches due to his use of narcotic medications and recommended that plaintiff change to low-dose long-acting analgesics and try a nerve block injection instead (Tr. at 434). Dr. Sharlin also noted that plaintiff "was not entirely forthright about his pain medication use" and "repeatedly underplayed his use of narcotics" (Tr. at 434). Dr. Sharlin refused to prescribe additional narcotic medications as plaintiff requested (Tr. at 434).

On July 16, 2009, plaintiff saw Dr. Baker in the Ozarks Community Hospital Pain Clinic for a right occipital nerve block[15] (Tr. at 486). Plaintiff requested OxyContin, but Dr.

---

[15]An occipital nerve block is an injection of a steroid or other medication around the greater and lesser occipital nerves that are located on the back of the head just above the neck area. The steroid injected reduces the inflammation and swelling of tissue around the occipital nerves. This may in turn reduce pain, and other symptoms caused by inflammation or irritation of the nerves and surrounding structures. Typically, headaches over the back of the head, including certain types of tension headaches and migraine headaches, may respond to occipital nerve blocks.

Baker refused to provide it (Tr. at 486). Dr. Baker offered a variety of other medications, all of which plaintiff declined, insisting that only Vicodin (acetaminophen and hydrocodone), Dilaudid (narcotic), or OxyContin would help (Tr. at 486). Eventually plaintiff agreed to an occipital nerve block, as previously recommended by Dr. Sharlin (Tr. at 486). Plaintiff left without a prescription, complaining that "nothing [Dr. Baker] offered was beneficial" for him (Tr. at 486). Later that day, July 16, 2009, plaintiff presented to the emergency room at Ozarks Community Hospital complaining of recent onset low back and right flank pain and requesting pain medication (Tr. at 421-424). Plaintiff was diagnosed with a kidney stone and given pain medication (Tr. at 422-423).

The next day, July 17, 2009, plaintiff saw Ms. Hudson, asking for refills of medication and complaining that depression medication was not working (Tr. at 463). Plaintiff said his license had been revoked, so he had no transportation, and he was living at home with his parents, which caused increased stress (Tr. at 463). Ms. Hudson diagnosed back pain, bipolar disorder, hypertension, and kidney stones and added Abilify (treats schizophrenia) to plaintiff's medications (Tr. at 463).

On July 24, 2009, plaintiff saw Dr. Sharlin at the neurology clinic, noting that the right nerve block the previous week was helpful and had resolved plaintiff's right-side pain, but he now had left-side head pain (Tr. at 432). Dr. Sharlin recommended another nerve block (Tr. at 430-432).

On July 30, 2009, plaintiff saw Dr. Baker complaining of left-side headache pain (Tr. at 485). Plaintiff told Dr. Baker he had good relief immediately after his previous nerve block, but the pain returned the very next day (Tr. at 485). Dr. Baker noted that plaintiff was aggressive and argumentative, claiming "he could buy his pain medication on the street if he

15

had to" (Tr. at 485). Dr. Baker administered a left occipital nerve block that day but said he would not treat plaintiff in the future (Tr. at 485).

On August 5, 2009, Donald Wantuck, M.D., a state agency consultative physician, reviewed the evidence of record and evaluated plaintiff's physical functional capacity (Tr. at 435-441). Dr. Wantuck found that plaintiff could lift 20 pounds occasionally and no weight frequently, and could stand and/or walk and sit for about 6 hours each in an 8-hour workday (Tr. at 436). He could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, and scaffolds (Tr. at 438). He should avoid concentrated exposure to extreme cold, vibration, fumes, and hazards (Tr. at 439).

On August 6, 2009, state agency psychologist Kenneth Burstin, Ph.D., completed a mental assessment finding that plaintiff had mild limitations in activities of daily living; mild limitations in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. at 450). Accordingly, Dr. Burstin found that plaintiff had no severe mental impairment. He noted that plaintiff had never seen a psychiatrist, had not sought consistent treatment for any mental impairment, had stopped taking prescribed medications, and had instead requested narcotic medication (Tr. at 452). Dr. Burstin thought plaintiff's allegations were "out of proportion to the medical evidence" (Tr. at 452).

On August 13, 2009, plaintiff saw Ms. Hudson and complained of headaches, stating that his referrals for pain management had been denied (Tr. at 462). Ms. Hudson diagnosed bipolar disorder, hypertension, and back pain; increased plaintiff's dosage of Abilify; and told plaintiff to stop smoking (Tr. at 462). She also told plaintiff she was unable to prescribe narcotics (Tr. at 462). She offered a prescription for non-narcotic medications, which plaintiff declined (Tr. at 462).

On August 18, 2009, plaintiff went to the St. John's Hospital emergency room complaining of flank pain, concerned that he might have a kidney stone (Tr. at 578-579). Plaintiff was given pain medication (Tr. at 584). Megan Riley, D.O., advised plaintiff to take Flomax[16] and call Robert Johnson, M.D., on Friday morning with a progress update (Tr. at 579).

On August 27, 2009, plaintiff saw Dr. Johnson at St. John's Hospital, complaining of right flank pain (Tr. at 565). Dr. Johnson noted that he had offered to treat plaintiff's kidney stone the previous week, but plaintiff declined (Tr. at 565). Dr. Johnson removed the stone and placed a stent (Tr. at 565-571). Plaintiff reported his only medication was Celexa (anti-depressant) (Tr. at 565).

On August 30, 2009, plaintiff saw Thomas Lewis, M.D., at the St. John's Hospital emergency room, complaining of flank pain that started 12 to 24 hours earlier (Tr. at 554-555). Dr. Lewis prescribed Toradol (treats moderate to severe pain) and Percocet (acetaminophen and hydrocodone. a narcotic) (Tr. at 554).

On September 11, 2009, plaintiff saw Ms. Hudson, requesting medication refills and asking about pain management options (Tr. at 461). Ms. Hudson reiterated that she was unable to provide more narcotic medications (Tr. at 461). Plaintiff verbalized understanding but was frustrated and angry (Tr. at 461). Ms. Hudson suggested that plaintiff establish treatment with a different practitioner (Tr. at 461).

On September 16, 2009, plaintiff saw William Graham, M.D., at the Jordan Valley Community Health Center and requested a "referral to pain management" (Tr. at 455). Plaintiff said he had been referred by Dr. Baker, since he was "unwilling to continue the methadone treatment [Dr. Baker] recommended" (Tr. at 455). Dr. Graham diagnosed knee

---

[16]For enlarged prostate, it makes urinating easier for men.

joint pain, reflux, migraines, possible bipolar disorder, and chronic pain syndrome, but told plaintiff that he would not prescribe narcotic medication (Tr. at 455). He referred plaintiff for consultation with a headache specialist (Tr. at 455).

On October 1, 2009, plaintiff saw Ms. Hudson and complained of right knee pain (Tr. at 459). Ms. Hudson diagnosed hypertension, knee pain, and neck pain (Tr. at 459). She considered a referral to a pain specialist, but noted that Dr. Baker refused to treat plaintiff any further (Tr. at 459). She ordered a knee x-ray, which was negative (Tr. at 459-460).

On October 6, 2009, plaintiff went to the St. John's Hospital emergency room, complaining of neck pain and chronic daily headaches (Tr. at 543-544). Plaintiff was given intravenous pain medication (Tr. at 552). A CT scan of plaintiff's head showed no acute abnormality (Tr. at 548). Likewise, a CT scan of plaintiff's cervical spine was normal (Tr. at 548). Janel Ochse, M.D., diagnosed headache and neck pain and prescribed Percocet (acetaminophen and hydrocodone, a narcotic) and Flexeril (muscle relaxer) (Tr. at 544, 548). Upon discharge, plaintiff said he felt better and his headache was completely resolved, though he had continued neck pain (Tr. at 551).

On October 26, 2009, plaintiff saw Savitha Bharadwaj, M.D., at Smith Glynn Internal Medicine in Springfield, Missouri, (Tr. at 489-496). Plaintiff complained of joint, back, chest, and neck pain; bipolar disorder; reflux; headache; hypertension; high cholesterol; and kidney stones (Tr. at 490). He said he had neck pain, but his symptoms had completely resolved (Tr. at 493). Plaintiff reported his medications as Abilify (treats schizophrenia), Crestor (for high cholesterol), and Percocet (narcotic) (Tr. at 491, 494). A physical examination was normal; the doctor observed no physiological signs of severe pain and noted that plaintiff had seen multiple providers in the last few months to get narcotic medication (Tr. at 496). Dr.

18

Bharadwaj recommended that plaintiff take anti-inflammatory medications and treat his lower back pain with warm soaks rather than narcotic medications (Tr. at 496).

On November 6, 2009, plaintiff went to the St. John's Hospital emergency room, complaining of back pain, exacerbated by raking leaves the day before (Tr. at 536-551). Plaintiff said he had not tried anything for his symptoms, and he was given Flexeril (muscle relaxer) and Percocet (narcotic) in the hospital (Tr. at 536-537, 543). Plaintiff left the hospital about an hour after arriving, claiming he was "feeling better" (Tr. at 541). Clinicians noted he was ambulatory and had a steady gait (Tr. at 541).

On November 17, 2009, plaintiff returned to the St. John's Hospital emergency room, complaining of recent exacerbation of back pain he attributed to his 2004 injury (Tr. at 527). Although plaintiff complained of pain, his gait and range of motion were normal (Tr. at 531). His mood and affect were likewise normal (Tr. at 532). Plaintiff was told to see a spine specialist and primary care physician, but plaintiff insisted that would not help, as Percocet was the only thing that would help his pain (Tr. at 534).

On November 27, 2009, plaintiff returned to the St. John's Hospital emergency room, requesting medication for recent onset neck pain (Tr. at 520-526). Plaintiff refused a CT scan unless he could go immediately (Tr. at 525). He was given one Percocet tablet (Tr. at 525).

On December 1, 2009, plaintiff saw family practitioner Lisa Roark, M.D., at the Family Medical Care Center to establish care, reporting that he was previously seen by Ms. Hudson at Ozarks and was "not happy with their 'system'" (Tr. at 476). Plaintiff said he had chronic back pain caused by a work accident; he had a worker's compensation claim and was "trying to get on disability" (Tr. at 476). Plaintiff said he had tried various medications and often went to the emergency room often to get morphine, most recently just three days earlier (Tr. at 476). He said he played drums and was involved in a Christian motorcycle group (Tr. at

19

476). Upon examination, Dr. Roark observed that plaintiff was alert and oriented with appropriate behavior and affect, normal gait and station, and adequate muscle strength and tone (Tr. at 477). She assessed chronic pain "as comment only," noting that plaintiff said he went to the emergency room weekly for medications (Tr. at 477). She prescribed Mobic (non-steroidal anti-inflammatory) and Lipitor (for high cholesterol) and recommended smoking cessation (Tr. at 477).

On December 2, 2009, plaintiff went to the St. John's Hospital emergency room requesting a "pain shot" and prescription for Percocet (narcotic) (Tr. at 504-506, 510-519). Clinicians advised plaintiff to use ice or moist heat for his pain (Tr. at 509). They told plaintiff they could not give him a narcotics injection unless he had a ride home (Tr. at 510, 514). Plaintiff told the clinician that his mother dropped him off, went to run errands, and would return to pick him up (Tr. at 510). Plaintiff left without any treatment, "irritated at having to produce a driver" (Tr. at 509-510). Kenneth Spangler, D.O., subsequently noted on the chart that he did not concur with the administration or prescription of narcotic medication due to plaintiff's history of non-compliance and emergency room abuse (Tr. at 517).

The next day, December 3, 2009, plaintiff returned to the St. John's Hospital emergency room requesting a "pain shot" (Tr. at 500-501, 503, 506-508). Plaintiff said he was at the emergency room the day before and was offered a "pain shot" if he had a driver (Tr. at 504). Plaintiff also acknowledged that he had driven himself to and from the hospital the previous day and lied to clinicians about it (Tr. at 500-508). Clinicians noted this and other inconsistent statements (Tr. at 501, 505). Plaintiff was offered ibuprofen for his pain but left the hospital before written discharge instructions could be given (Tr. at 505).

20

On December 15, 2009, plaintiff saw Dr. Roark again, complaining of chronic back pain (Tr. at 474). Plaintiff said he had an appointment at St. John's Pain Clinic but decided not to go (Tr. at 474). Upon physical examination, Dr. Roark observed that plaintiff had a normal gait, station, and range of motion, with adequate muscle strength and tone (Tr. at 474). He was alert and oriented, with appropriate behavior and affect (Tr. at 474). Plaintiff said he had refused any medications other than oxycodone (Tr. at 474). Dr. Roark explained to plaintiff that he was not a good candidate for narcotics and she encouraged physical therapy instead (Tr. at 475). She prescribed lisinopril for hypertension and continued plaintiff's Mobic (non-steroidal anti-inflammatory) (Tr. at 475).

On January 13, 2010, plaintiff saw Dr. Roark, complaining of pain (Tr. at 471). Plaintiff said he had chronic back pain and was "trying to get disability" (Tr. at 471). He had been turned down by multiple pain clinics due to his history of refusing treatment (Tr. at 471). He last had physical therapy in 2005 and was experiencing some depression because of his back problems (Tr. at 471). Upon physical examination, Dr. Roark observed that plaintiff had normal gait and station, normal range of motion, and adequate muscle strength and tone; and his behavior and affect were appropriate (Tr. at 471). She diagnosed depression, back pain, and tobacco addiction; prescribed amitriptyline (an anti-depressant used to treat insomnia); and referred plaintiff to physical therapy (Tr. at 471-472).

On February 11, 2010, plaintiff saw Dr. Roark complaining of pain-related depression and requesting medications for pain (Tr. at 468). Upon physical examination, Dr. Roark observed that plaintiff's gait, station, range of motion, and muscle strength were normal (Tr. at 468). She diagnosed history of narcotic abuse and referred plaintiff to a pain specialist (Tr. at 468-469). She increased plaintiff's dosage of amitriptyline and added Prozac (anti-depressant) (Tr. at 469).

On April 1, 2010, plaintiff saw Dr. Roark again, complaining of neck pain, burning scalp pain, and abdominal strain (Tr. at 466-467). Dr. Roark diagnosed ventral hernia,[17] recommended stretching exercises, and prescribed lisinopril for plaintiff's mildly elevated blood pressure (Tr. at 466-467). She also noted plaintiff's noncompliance with medication (Tr. at 467). A subsequent abdominal CT scan was normal (Tr. at 598).

On July 6, 2010, plaintiff first saw Richard Boyd, M.S., at the Ash Grove Family Care Center, reporting that he was "seeking disability due to back injury" and was experiencing some feelings of depression (Tr. at 667). Plaintiff reported a history of mental illness, including a previous diagnosis of bipolar disorder, and prior incarcerations (Tr. at 667-668). Mr. Boyd diagnosed bipolar disorder, possible learning disorder, and possible borderline and narcissistic personality disorder, and assigned a GAF of 60 to 65[18] (Tr. at 667-668). He recommended weekly cognitive behavioral therapy, but noted that plaintiff was not a candidate for antidepressant medication (Tr. at 669).

On July 18, 2010, plaintiff went to the Cox Health emergency room in Springfield, Missouri, complaining of severe chest pain and shortness of breath (Tr. at 616-618). A CT scan of plaintiff's chest showed noncalcified granulomas[19] in the lungs and fatty infiltration of

---

[17]Hernias most commonly develop in the abdominal wall, where an area weakens and develops a tear or hole. Abdominal tissue or part of the intestines may push through this weakened area, causing pain and potentially serious complications. Ventral hernias are a type of abdominal hernia. They may develop as a defect at birth, resulting from incomplete closure of part of the abdominal wall, or develop where an incision was made during an abdominal surgery, occurring when the incision does not heal properly.

[18]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

[19]A granuloma is a small area of inflammation in tissue. Granulomas are most often the result of an infection and most frequently occur in the lungs.

22

the liver[20] (Tr. at 619). Mike Galindo, D.O., recommended that plaintiff be admitted to the hospital for further evaluation, but plaintiff refused to stay in the hospital, even though he claimed his chest pain was still an 8 out of 10 after two doses of Fentanyl (narcotic) and Dr. Galindo told plaintiff he could not rule out a life-threatening condition without further testing (Tr. at 616). Dr. Galindo told plaintiff he could not give him morphine because he had been complaining of 10/10 chest pain. Dr. Galindo told plaintiff "in great detail multiple times" "that with his 10/10 chest pain" and abnormal vital signs, plaintiff should undergo further testing (Tr. at 616). But plaintiff refused, said his chest pain had fully resolved, and said he wanted to go home and smoke (Tr. at 616). Dr. Galindo noted in detail plaintiff's noncompliance and wrote repeatedly that plaintiff left the hospital "AGAINST MEDICAL ADVICE." (Tr. at 617-618).

On July 27, 2010, plaintiff saw Mr. Boyd for psychotherapy, complaining of anxiety, depression, and agitation (Tr. at 665-666). Plaintiff said doctors had recently tried to hospitalize him, but he was reluctant go in the hospital until his ex-wife returned to Springfield (Tr. at 665). Mr. Boyd diagnosed bipolar disorder with possible borderline personality disorder and narcissistic personality disorder, and assigned a GAF of 60 to 65 (Tr. at 665).

On July 28, 2010, plaintiff saw Frank Romero, Jr., M.D., at Cox Health, complaining of chest pain (Tr. at 607). Dr. Romero admitted plaintiff for observation and advised plaintiff to stop smoking (Tr. at 608-609). An x-ray of plaintiff's chest that day was normal (Tr. at 610). A stress test the following day was also normal (Tr. at 611-612).

---

[20]Hyperlipidemia is a known risk factor for fatty infiltration of the liver, a condition that can progress to cirrhosis and liver failure.

23

On August 8, 2010, plaintiff saw Alan Jo, M.D., at Cox Health, for a cardiac stress test, which was also normal (Tr. at 603).

On August 17, 2010, plaintiff saw Mr. Boyd for psychotherapy (Tr. at 663). Mr. Boyd noted a diagnosis of bipolar disorder and assigned a GAF of 60 to 65 (Tr. at 663-664). That day, Mr. Boyd completed a check-the-box Medical Source Statement Mental, checking boxes on the form to indicate that plaintiff had moderate to marked limitations in understanding and memory, moderate to marked limitations in sustained concentration and persistence, moderate to marked limitations in social interaction, and moderate to marked limitations in his ability to adapt (Tr. at 600-601). Mr. Boyd made no explanatory comments on the form (Tr. at 602).

On August 27, 2010, plaintiff saw Harcharan Bains, M.D., at the Ash Grove Family Care Center (Tr. at 678-679). Plaintiff said his depression had not improved, yet he acknowledged that he had not yet bothered to pick up recently-prescribed medication from the pharmacy (Tr. at 679). Dr. Bains stated that since most of plaintiff's issues were pain related, he could not continue to increase plaintiff's dosage of Klonopin (treats anxiety) (Tr. at 679). He advised plaintiff to continue therapy with Mr. Boyd and see a pain doctor or go to the hospital if he continued to feel depressed (Tr. at 679).

On August 31, 2010, plaintiff saw Mr. Boyd for therapy, complaining of conflict with his parents and vague suicidal ideation (Tr. at 710-711). Mr. Boyd thought plaintiff was unstable, but plaintiff said he planned to seek hospitalization at Cox North for review of his medications (Tr. at 711).

On September 8, 2010, plaintiff saw Mr. Boyd again, reporting conflict with his parents and financial difficulties (Tr. at 708). Mr. Boyd thought plaintiff responded well to

24

the therapy session and was able to see some insight into the need for behavioral changes (Tr. at 708-709).

On September 14, 2010, plaintiff saw Mr. Boyd and completed an assessment for adult ADHD (Tr. at 706-707).

On September 15, 2010, plaintiff saw Mr. Boyd for behavioral therapy and complained of feelings of depression and anxiety (Tr. at 703). Mr. Boyd noted that plaintiff's self-reported symptoms indicated that he fit the criteria for an ADHD diagnosis (Tr. at 704). Mr. Boyd diagnosed bipolar disorder by previous assessment, ADHD, possible learning disorders, borderline personality disorder, and narcissistic personality disorder (Tr. at 704). He assigned a GAF of 65 and referred plaintiff for medication treatment (Tr. at 704).

On September 21, 2010, plaintiff saw Mr. Boyd for psychotherapy, reporting difficulty getting along with his parents and family members (Tr. at 701-702).

On October 6, 2010, plaintiff saw Dr. Bains for medication management (Tr. at 675-676). Plaintiff said that his depression had improved slightly, but he was still feeling hopeless due primarily to family stressors (Tr. at 676). Dr. Bains reiterated that since most of plaintiff's issues were pain related, he could not continue to increase plaintiff's dosage of medication (Tr. at 673). He told plaintiff to continue therapy with Mr. Boyd and see a pain doctor or go to inpatient treatment if he continued to feel depressed (Tr. at 673).

On October 19, 2010, plaintiff saw Mr. Boyd for psychotherapy, reporting his relationship with his father had improved and he was feeling less anxiety, though he continued to have chronic pain (Tr. at 699). The therapist noted that plaintiff's goals related to his chronic pain, economic problems, and estranged relationship with his ex-wife (Tr. at 699).

On October 26, 2010, plaintiff saw Mr. Boyd again, complaining about anxiety and mood disturbance related to chronic pain and stress with his ex-wife and daughter (Tr. at 697).

On November 1, 2010, plaintiff presented to Mark Bult, M.D., at the Citizens Memorial Healthcare Pain Management Clinic, for an initial visit, reporting chronic neck and low back pain since a 2006 work-related injury, along with a recent onset of right foot pain (Tr. at 727). Plaintiff asked for an injection in his foot (Tr. at 727). He said he had been to the emergency room many times and they would not provide any more pain medication (Tr. at 728). Dr. Bult diagnosed chronic low back pain, degenerative disc disease with radicular symptoms in the right lower extremity, and tobacco addiction (Tr. at 730). He administered an epidural steroid injection at L5-S1 (Tr. at 729).

On November 16, 2010, plaintiff saw Dr. Bult again, complaining of low back and neck pain (Tr. at 722-723). Plaintiff said most of his pain was in his left leg, not the right leg as it was at the previous visit (Tr. at 723). Dr. Bult diagnosed cervicalgia (neck pain) and lumbago (low back pain), administered a repeat lumbar epidural steroid injection, and encouraged plaintiff to stop smoking (Tr. at 724).

On November 30, 2010, plaintiff saw Dr. Bult again, complaining of back pain (Tr. at 687). Dr. Bult administered an epidural steroid injection and told plaintiff to stop smoking (Tr. at 687-688).

On December 1, 2010, plaintiff saw Mr. Boyd for therapy, reporting mood disturbances due to ongoing pain (Tr. at 695-696).

On December 3, 2010, plaintiff saw Dr. Bains, complaining that his Klonopin was not effective (Tr. at 672-673). Again, Dr. Bains noted that he could not increase plaintiff's dosage (Tr. at 673).

On December 7, 2010, plaintiff saw Mr. Boyd, complaining of conflict with his father and hypervigilance, noting that his irritation dated back to the time he spent in prison (Tr. at 693-694). Mr. Boyd noted an improvement in plaintiff's insight and assigned a current GAF of 60 to 65 (Tr. at 693).

On December 14, 2010, plaintiff saw Dr. Bult, complaining of back pain (Tr.682-684). Dr. Bult diagnosed cervicalgia and lumbago, ordered an MRI, and emphasized the importance of smoking cessation (Tr. at 682-684).

On December 16, 2010, plaintiff saw Mr. Boyd for psychotherapy, reporting considerable frustration with the healthcare delivery system (Tr. at 691). Mr. Boyd encouraged plaintiff to change his demeanor and reduce his defensiveness in order to communicate better with physicians (Tr. at 691-692).

On December 21, 2010, plaintiff saw Juris Simanis, M.D., at the Ash Grove Family Care Center for a blood pressure check, also complaining of new onset right foot pain (Tr. at 713-714). Dr. Simanis noted plaintiff's two-packs-a-day cigarette addiction, elevated blood pressure, hyperlipidemia, and foot pain, adding that plaintiff was noncompliant with medication for blood pressure and hyperlipidemia (Tr. at 714). Plaintiff complained of right foot pain, but said he had not taken any pain medication or used any ice or heat for pain relief (Tr. at 715). Upon physical examination, the doctor observed that plaintiff's range of motion and strength were intact (Tr. at 715). He administered a local lidocaine injection and recommended over-the-counter ibuprofen and ice (Tr. at 717).

On January 4, 2011, plaintiff had x-rays of his cervical spine, which showed only mild degenerative changes (Tr. at 752).

On January 18, 2011, plaintiff saw Mr. Boyd for therapy, complaining of ongoing pain (Tr. at 732-733). Mr. Boyd assigned a GAF score of 60 to 65 (Tr. at 732).

On January 25, 2011, plaintiff underwent a CT scan of his neck (Tr. at 738). The scan was unremarkable (Tr. at 738). An MRI of plaintiff's cervical spine that day showed some degenerative disc disease, but no evidence of epidural abscess or inflammation and was otherwise unremarkable (Tr. at 739).

Plaintiff submitted additional evidence to the Appeals Council only (Tr. at 4-5). On July 20, 2011, Mr. Boyd completed a second Medical Source Statement form (Tr. at 4-5, 759-760). Mr. Boyd checked boxes indicating that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures
- The ability to understand and remember very short and simple instructions
- The ability to carry out very short and simple instructions
- The ability to be aware of normal hazards and take appropriate precautions

He found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions
- The ability to carry out detailed instructions
- The ability to make simple work-related decisions
- The ability to set realistic goals or make plans independently of others

He found that plaintiff was markedly limited in the following:

- The ability to sustain an ordinary routine without special supervision
- The ability to ask simple questions or request assistance
- The ability to respond appropriately to changes in the work setting
- The ability to travel in unfamiliar places or use public transportation

He found that plaintiff was extremely limited in the following:

- The ability to maintain attention and concentration for extended periods

28

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

Mr. Boyd wrote, "Mr. Morris' [sic] condition is not expected to change within the next year due to severity and difficulties providing effective resolution of personality disorder and conditions that creates [sic] chronic pain." (Tr. at 760).

## C.    *SUMMARY OF TESTIMONY*

During the May 5, 2011, hearing, plaintiff testified; and Terri Crawford, a vocational expert, testified at the request of the ALJ.

## 1.    **Plaintiff's testimony.**

Plaintiff has lived with his parents for the past three years since his divorce (Tr. at 34). Plaintiff has Medicaid (Tr. at 34). He quit school when he was 16 (Tr. at 35). When he recently found out he could no longer do concrete work, he went through testing for about two weeks to try to get his GED but he was told it would "take an awful lot to get it" so he thought he would have to do something else (Tr. at 35). He has "just regular skills" as far as reading (Tr. at 35). When he was in school, he never opened a book, never did homework, and was always in trouble (Tr. at 35). He never knew how far behind he was until "this

happened" (Tr. at 35).  He can read enough to get by, and he can write (Tr. at 35).  He cannot

do even simple addition or subtraction (Tr. at 35).  He was unable to help his daughter with

math when she was in third grade (Tr. at 35).  He can "maybe" make change if it is less than a

dollar (Tr. at 36).

Plaintiff last worked full time when he moved back to Springfield (Tr. at 37).  He went

deer hunting over a weekend and then went back to work on Monday, bent over, and then

went to his knees and thereafter never worked again (Tr. at 37-38).

When asked what was his biggest problem preventing him from working full time,

plaintiff said it was his back (Tr. at 38).  His back problem has ruined his life (Tr. at 38).  He

was trying to rake leaves and only lasted ten minutes (Tr. at 38).  His back pain is present all

the time (Tr. at 38).  His doctor did not want to do surgery because worker's comp would not

pay for it (Tr. at 38).  Plaintiff tried physical therapy but could not do it (Tr. at 38).  He cannot

sit for very long or put any pressure on that spot (Tr. at 38).  He is on the "strongest"

medication -- Oxycodone -- but it does not help (Tr. at 38).  Plaintiff tries not to bend at all

(Tr. at 39).

Plaintiff's knees and elbows hurt more with weather changes due to arthritis (Tr. at

39).  Sometimes he has to use a cane for a day or two as a result (Tr. at 39).  Sitting for a while

causes so much pain that it is hard to get up (Tr. at 39).  He can only sit for 15 to 20 minutes

(Tr. at 45).  Plaintiff cannot stand and wash dishes because it hurts his elbows (Tr. at 40).  His

fingertips get numb and he has almost dropped his coffee cup a few times (Tr. at 40).  He can

stand for 10 minutes at a time (Tr. at 45).  Plaintiff cannot lift or carry anything at all -- "I

used to fish tournaments and that was going to be my life is, is fishing.  But hold the rod in, in

front of me, I can't do it for ten minutes.  I mean, there's, there's nothing you can when, when

Case 6:11-cv-03494-REL   Document 17   Filed 03/29/13   Page 30 of 49

it gets to burning and stinging like that, you know, I can take the medication and that, but it don't make it go away, it's there." (Tr. at 45-46).

Plaintiff does not take orders well, he does not get along with people, and his depression has caused him to disconnect from the world (Tr. at 40). Plaintiff has problems with anger -- "If it ain't my way, then there's a problem." (Tr. at 41). When asked for a specific example, plaintiff said, "Just normal daily stuff. If, if it, if it ain't going my way, then there's hell to pay." (Tr. at 41). When asked to describe the last time his anger was a problem, plaintiff said a few days earlier he was going to bake chicken and got into an argument with his mother about it: "She's like me, she just blows up at anything. And we both blew up and I just threw it to the side and said I'm not cooking it then." (Tr. at 41). Plaintiff was asked if there had been an instance recently when the other person was not yelling at him but he started yelling at the other person (Tr. at 41). He said that happens every day, but when asked to think of a specific example, he could not (Tr. at 41). He just said it was not working out staying with his parents (Tr. at 41). Plaintiff then thought of an example: he told someone at Dr. Boyd's[21] office to stop calling several times a day to remind him of his appointments (Tr. at 42).

When asked if he has any problems with concentration, plaintiff said, "I have, I don't know it's the, the depression and, and, and being in the spot that I'm in, I don't even have a car, I, I guess they call it short term memory loss and I've noticed that, that that's getting worse. I just can't, I can't remember anything." (Tr. at 42). Plaintiff had been seeing Richard Boyd every week, and he was given medicine for depression and anger (Tr. at 42-43). It is not helping -- it just makes him numb -- but now his appointments are down to every other week

---

[21]Mr. Boyd is a counselor with a master's degree. He is not a doctor, though plaintiff referred to him as a doctor.

31

(Tr. at 42-43). Plaintiff can be an angel one minute and a devil the next, and he does not have control over it and the medicine is not helping with it (Tr. at 43). When asked whether he has racing thoughts, plaintiff said:

> I, I'm, I'm constantly, I guess with, with bipolar, when, like if, if a person that don't have it, if a person that don't have it, if you take like a downer you would, you know, go down and that. But with me it's the opposite, it just makes me crazy, makes me go, the mind just races and races and I, I can't sit still.

(Tr. at 43).

On many occasions, plaintiff would physically fight with his coworkers or supervisors and get kicked out of "the place" (Tr. at 43). One time when he was working, he could not take someone standing over his shoulder watching everything he does -- the person said something and plaintiff turned around and hit him (Tr. at 44). He was fired for that (Tr. at 44). That was "years ago" (Tr. at 44). Plaintiff does not remember whether the person said something offensive or was just trying to tell plaintiff how to do his job (Tr. at 44). He was asked whether, since that occasion, he had had any difficulty accepting instructions or criticism from supervisors (Tr. at 44). Plaintiff said:

> Oh, that don't, that don't work good with me at all. Even, even if they're right, I'll fight with them about it. That's why I always chose concrete and building because I was outdoors and there wasn't really a boss. You knew what had to be done and you did it, and I was good at it.

(Tr. at 44).

Plaintiff can no longer do that type of work because he cannot bend over for five minutes, he cannot use a nail gun to put a wall together, he cannot be on his knees doing concrete (Tr. at 44-45).

Plaintiff tries to help with cooking, and he tries to help cut the grass with a riding lawn mower (Tr. at 46). The week before the hearing, he spent 15 to 20 minutes on the mower and then had to go in the house (Tr. at 46). He took pain pills, lay down, and was in

32

pain for the next two days (Tr. at 46). Plaintiff gets up with a headache, takes medicine, drinks a pot of coffee, watches television, and then goes back to bed (Tr. at 47). He spends his entire day in bed (Tr. at 47). Plaintiff cannot focus on television programs, but he has never been able to do that (Tr. at 47). He can read his Bible for a little bit before his neck starts hurting (Tr. at 47). Plaintiff has a driver's license, but he cannot focus to drive for more than 15 to 20 minutes, and sitting in that certain position bothers him (Tr. at 47). Plaintiff uses his dad's car to drive to church on Sundays -- the trip is about 10 minutes (Tr. at 47-48). Plaintiff has difficulty focusing at church, and he has to get up three of four times to walk around -- he goes out into the lobby to have coffee and watch the service on the big screen (Tr. at 48).

Plaintiff has no hobbies (Tr. at 48). He used to fish and hunt, but the last time he did either of those things was in 2005 (Tr. at 48). However, plaintiff had testified earlier that he tried to fish with his dad a few weeks earlier, and he was asked about that (Tr. at 48). Plaintiff said he only stayed out for about two hours because his dad is not much of a fisherman (Tr. at 48-49). He has no problems with personal care except that it "hurts like hell" to lean over the sink to shave (Tr. at 49).

Plaintiff testified that he has neither a car nor a motorcycle, but that he had a car 15 to 20 years ago (Tr. at 49-50). He used to play the drums in church but has not done that for years (Tr. at 50).

> Q.    So if you if Dr. Roark wrote in December of '09 that you played drums in church and were in a Christian motorcycle group, would that be true?
>
> A.    Oh, yeah, uh-huh.
>
> Q.    At that time then?
>
> A.    Yeah, but I never had a bike.
>
> Q.    You had, you were a member of a motorcycle group but didn't have a bike?

33

A.      Right, you don't, it's not required.  It's --

Q.      Well, did you attend meetings?

A.      Yeah.

Q.      And how often were the meetings?

A.      That was the first Tuesday of every month.  I haven't been to one in the last three years.

Q.      Well, this was December 1st of '09, were you attending meetings at that time?

A.      I don't think so.  That was when, well, yeah, I think, that was when I lived out in Aurora where, where the chapter's at and that's why I chose that one because it didn't require that you had to ride, or have a motorcycle, it was just a function for, for Christian people.

Q.      And you were meeting monthly?

A.      Yeah, once a month.

Q.      And were you playing drums at that time? . . .

A.      No, uh-uh.  No, that's -- that's been years ago.

Q.      Did you fish last year?

A.      No, this year, a couple of weeks ago.

Q.      Did you fish at all last year?

A.      No.

(Tr. at 50-51).

**2.      Vocational expert testimony.**

Vocational expert Terri Crawford testified at the request of the Administrative Law Judge.  Plaintiff's past relevant work as a concrete finisher is heavy work at the skilled level (Tr. at 52).  His past relevant worker in construction was heavy work at the semi-skilled level (Tr. at 52).

34

The first hypothetical involved a person with the limitations described by plaintiff in his testimony; such a person could not work (Tr. at 52).

The second hypothetical involved a person with the limitations described by Mr. Boyd (Tr. at 599-601) in his Medical Source Statement (Tr. at 52). The vocational expert testified that such a person could not work (Tr. at 53).

The third hypothetical involved a person able to stand or walk six hours per day; sit six hours per day; lift 20 pounds occasionally and ten pounds frequently; had limited ability to push or pull with the legs; could occasionally bend, stoop, crouch, squat, kneel, and crawl; should avoid working at heights, around hazardous unprotected moving equipment, extreme cold, extreme dust, fumes, poor ventilation, or vibration; is not able to handle high stress work; would not be able to do fast-paced activity or work requiring strict and explicit production or other quotas, deadlines, scheduling or unusual changes in the work setting; could not sustain a high level of concentration for sustained precision or sustained attention to detail; could not interact with the public; and cannot interact closely with coworkers (Tr. at 53). The vocational expert testified that such a person could work as a production assembler, DOT 706.687-010, with 54,000 in the country and 750 in Missouri, or a package hand, DOT 920.587-018, with 206,000 in the country and 4,300 in Missouri. These positions cannot be done sitting, but there would be no more than six hours of standing per day (Tr. at 54-55).

The vocational expert clarified that workers in light jobs are able to move about the work station and around the premises as part of their jobs (Tr. at 57-58). The person may need to move along a line, may change work stations as production needs require, and would move around in their jobs (Tr. at 58). The vocational expert testified that the plastic factory in Nixa allows its workers to sit most of the day or stand all day long, whichever the worker prefers (Tr. at 58).

The fourth hypothetical involved a person who would not be able to accept criticism or instructions from a supervisor (Tr. at 57). The vocational expert testified that such a person could not perform those jobs (Tr. at 57).

The fifth hypothetical was the same as the third except the person could only occasionally reach, handle, and finger -- the vocational expert testified that such a person could not do those jobs, the worker must be able to reach, handle and finger frequently (Tr. at 57).

## V.   FINDINGS OF THE ALJ

Administrative Law Judge David Fromme entered his opinion on June 24, 2011 (Tr. at 10-21). He found that plaintiff's last insured date was December 31, 2010 (Tr. at 10, 12).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 12).

Step two. Plaintiff suffers from the following severe impairments: Somatoform disorder; a personality disorder with histrionic, narcissistic, and borderline traits; anxiety; depression; bipolar mood disorder; cervical degenerative disc disease; and lumbar degenerative disc disease (Tr. at 12). Plaintiff's hypertension is not a severe impairment; plaintiff's migraine disorder is not a severe impairment; his history of ventral hernia is not a severe impairment (Tr. at 13). Plaintiff does not have a medically determinable knee impairment (Tr. at 13).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13). The ALJ specifically analyzed and rejected listings 12.04, 12.06, 12.07 and 12.08 (Tr. at 14-15).

Step four. Plaintiff retains the residual functional capacity to perform light work except he can only occasionally push or pull with his lower extremities, bend, stoop, crouch,

36

squat, kneel or crawl; he cannot tolerate unprotected exposure to heights or hazards; he cannot tolerate extreme cold, dust, fumes, poor ventilation, or vibration; the job must involve a simple routine or simple repetitive tasks; he should avoid high-stress jobs and should not be required to interact with the public, closely interact with coworkers, or tolerate the stress of fast-paced activity, strict and explicit quotas, deadlines, schedules, or unusual changing work settings (Tr. at 15). With this residual functional capacity, plaintiff is unable to perform his past relevant work (Tr. at 19).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony that he could not accept criticism or instruction from supervisors was not credible. Plaintiff also argues that the opinion of plaintiff's treating psychologist, Richard Boyd, Psy.D., supports plaintiff's subjective allegations.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

Case 6:11-cv-03494-REL   Document 17   Filed 03/29/13   Page 37 of 49

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The record shows that the claimant has lived with his parents since his divorce, out of financial necessity, and cares for his personal needs independently. While he alleged that he was bedfast, he admitted to examining psychologist Michael Whetstone, Ph.D. in 2006 that he hunted, played drums in a band at church, and drove to take his wife and daughter places. In 2009, after his divorce, he told primary care physician Lisa Roark, M.D. that he continued to play drums, and had joined a Christian motorcycle group. He testified that he had not played drums in "many years" and had never owned a motorcycle, stating that motorcycle ownership was not required for membership but not explaining why a man with no motorcycle would join a motorcycle club. The undersigned gives the third party reports more weight in this matter than the self-serving testimony.
>
> . . . He reported that he had been fired from several jobs due to inability to take orders, but testified that he had been able to work as a cement finisher for many years because he was only loosely supervised and "just did the job". He testified to conflicts with his

38

parents, with whom he resides, but also testified that his mother was also easily angered and brought on or exacerbated the conflicts.

* * * * *

The clinical and objective findings herein are inconsistent with allegations of total debilitation. The record is devoid of any evidence showing a significant degree of muscle atrophy, paravertebral muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance, or reduced range of motion of the spine or joints, an indication that claimant continues to move about on a fairly regular basis. Moreover, there is no diagnostic evidence of herniated disc or spinal stenosis to substantiate the claimant's complaints of debilitating pain. In fact, x-ray, CTs and MRIs of the spine have shown nothing more significant than some degenerative disc disease in the neck that might abut a nerve root. Finally, as to the claimant's complaints of knee pain, the Administrative Law Judge notes that although numerous studies have been done, they have all been negative.

The claimant has shown great willingness to take strong pain medication. However, he also has a history of alcoholism and drug addiction, and the medical evidence shows a significant amount of drug seeking behavior. Thus, his willingness to take strong pain medication is not strong evidence of incapacitating pain.

The claimant was referred to Jay Baker, D.O. at the Ozarks Community Hospital (OCH) pain clinic in November 2008. Dr. Baker prescribed Methadone and exercise in addition to the earlier prescription for Oxycontin. The claimant did not do the exercise and did not attend the psychological evaluation scheduled, so Dr. Baker discontinued the Oxycontin. The claimant then obtained his drug of choice in the OCH emergency department, refusing all medication other than Oxycodone from Dr. Baker until finally being dismissed from Dr. Baker's practice in July 2009 due to his aggressive and argumentative behavior toward his staff. Drug seeking behavior was also reported by neurologist Kenneth Sharlin, M.D., by primary care physician William Graham, M.D., and by primary care physician Lisa Roark, M.D. Dr. Roark not only reported that the claimant was "working on getting disability but also reported that he refused a referral to St. John's pain clinic. Emergency room personnel at St. John's Hospital also reported demands for specific drugs, including lying to emergency room personnel in efforts to obtain the drugs desired.

The medical evidence reports several instances of symptom magnification in connection with the claim for workers' compensation and Social Security disability benefits. Formal functional capacity assessments were done on January 30, 2006 and on October 17, 2006. On both occasions, the examiner reported overt signs of symptom magnification and minimal effort in testing. The observations were reported in some detail, and are quite persuasive. This evidence reflects adversely on claimant's credibility.

* * * * *

39

Orthopedic surgeon Paul Olive, M.D. examined the claimant on July10, 2007 in connection with his claim for workers' compensation. Dr. Olive found 5% permanent partial disability, and thought he could perform "medium" work.

Charles Mauldin, M.D. examined the claimant in connection with a claim for Medicaid on May 22, 2008 and reported complaints of low back pain, but also reported the signs were "nonorganic" or inconsistent with the way the human body actually works. In his opinion, the claimant had no medically determinable impairment.

S. Bharadaraj, M.D. examined the claimant on October 26, 2009 and reported complaints of chronic low back pain. Dr. Bharadaraj also reported an admission that the claimant had seen multiple physicians to obtain narcotics. Primary care physician Lisa Roark M.D. reported normal gait and station despite complaints of back pain, and reported persistent drug seeking during the four months he was in her care, December 2009 through March 2010.

The claimant's allegation that he cannot tolerate instruction or criticism by employers, cannot concentrate well enough to learn, and cannot get along with other people is not well supported. In so finding, the undersigned has taken into account the claimant's daily activities as well as the reports of examining and treating mental health professionals.

The claimant's alleged inability to concentrate is inconsistent with the formal psychological testing done by Craig Shifrin, Psy.D. on April 16, 2008. Dr. Shifrin, who examined the claimant in connection with a claim for Medicaid, found "some" limitations in attention and work activity. Likewise, Michael Whetstone, Ph.D. observed no obvious difficulties with concentration, attention, or short-term memory during his examination at the request of Dr. Lennard. Further, the Function Report completed by the claimant, in his own hand, in connection with this application for benefits is a coherent and organized piece of writing. While the claimant may have great difficulty with numbers, as he alleges, he is hardly the illiterate person he attempts to portray.

As to his alleged inability or unwillingness to accept direction the claimant's work history shows that he was able to work for many years in the construction industry. He was fired as a cable installer due to a conflict with a supervisor, but ths occurred when he was 19 years old, more than 30 years ago. His work history is inconsistent with his alleged intransigence.

(Tr. at 14, 16-19).

Plaintiff reported in a Function Report that he has never been able to pay bills, handle a bank account, count change, or use a checkbook or money orders. He said he has never been able to do these things because he "can't count." His ability to handle money has not changed since his condition -- "never have been able to, to begin with." Plaintiff testified that

one time when he was working, he could not take someone standing over his shoulder watching everything he does -- the person said something and plaintiff turned around and hit him and was fired for that. However, he does not remember whether the person said something offensive or was just trying to tell plaintiff how to do his job, and in any event, "[t]hat was "years ago" according to plaintiff's testimony.

Plaintiff takes exception to the ALJ's reasoning, i.e., that plaintiff has been able to work at the substantial gainful activity for many years despite his alleged inability to accept criticism or instruction from supervisors. In support he points out only that "Richard Boyd, Psy.D." provided an opinion stating that plaintiff's unwillingness to accept direction may create a barrier to him achieving established goals. First I note that Mr. Boyd is a counselor, he is not a doctor. And there is no doctor in this record with "Psy. D." as credentials except Craig Shifrin, Psy. D., of Springfield, Missouri, who examined plaintiff at the request of a state agency. He was not a treating doctor. Dr. Shifrin determined plaintiff had no long-term mental disorders that would interfere with ability to work, nor was he mentally disabled or impaired. Since plaintiff's only argument with respect to the credibility analysis is that Mr. Boyd's opinion supported plaintiff's testimony, I will address that opinion here.

On August 9, 2006, the Social Security Administration issued Social Security Ruling (SSR) 06-3p, 71 Fed.Reg. 45,593 (Aug. 9, 2006). The ruling clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources." SSA separates information sources into two main groups: "acceptable medical sources" and "other sources." It then divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007). Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20

41

C.F.R. § § 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there

are three major distinctions between acceptable medical sources and the others:

1. Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment. Id.

2. Only acceptable medical sources can provide medical opinions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

3. Only acceptable medical sources can be considered treating sources. 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical

sources" include nurse practitioners, physician assistants, licensed clinical social workers,

naturopaths, chiropractors, audiologists, and therapists. "Non-medical sources" include school

teachers and counselors, public and private social welfare agency personnel, rehabilitation

counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors,

clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically

determinable impairment," according to SSR 06-3p. Sloan v. Astrue, 499 F.3d 883, 888 (8th

Cir. 2007). "Instead, there must be evidence from an 'acceptable medical source' for this

purpose. However, information from such 'other sources' may be based on special knowledge

of the individual and may provide insight into the severity of the impairment(s) and how it

affects the individual's ability to function." Id. quoting SSR 06-3p.

SSR 06-3p is a clarification of existing SSA policies. The SSA explained its reasons for

issuing the ruling:

With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as

42

impairment severity and functional effects, along with the other relevant evidence in the file.

The ruling directs the SSA's adjudicators to give weight to opinions from medical sources who are not "acceptable medical sources":

> Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions. . . .

> [D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

In general, according to the ruling, the factors for considering opinion evidence include:

- How long the source has known and how frequently the source has seen the individual;

- How consistent the opinion is with other evidence;

- The degree to which the source presents relevant evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

- Any other factors that tend to support or refute the opinion.

SSR 06-3p; 71 FR 45593-03.

In this case, Mr. Boyd saw plaintiff on July 6, 2010, and July 26, 2010 -- two visits over a period of less than one month -- prior to completing the Medical Source Statement Mental.

During those two visits, Mr. Boyd assigned plaintiff a GAF indicating only mild symptoms on both occasions. On neither visit did Mr. Boyd make any observations consistent with a limitation in plaintiff's ability to understand, remember, concentrate, interact, or adapt. Yet, after those two visits, he found, on the Medical Source Statement, that plaintiff had moderate to marked limitations in these areas. The other medical records in this case are consistent with Mr. Boyd's records and are inconsistent with Mr. Boyd's opinion in the Medical Source Statement. There is no evidence of a marked (or even moderate) limitation in plaintiff's ability to understand, remember, or concentrate. Plaintiff's difficulty in interacting consistently dealt with (1) his family members, or (2) medical professionals who would not give him narcotics.

There is no question that Mr. Boyd did not present any relevant evidence to support his opinion. He provided no explanation at all to support his opinion.

Because Mr. Boyd's Medical Source Statement is the only thing plaintiff can point to in the record to corroborate his subjective complaints, and Mr. Boyd's opinion in the Medical Source Statement was properly rejected by the ALJ, plaintiff's argument on this basis fails.

I find that the reasons listed by the ALJ in his order for discrediting plaintiff's subjective complaints are supported by the substantial evidence in the record.

## VII.  VOCATIONAL EXPERT TESTIMONY

Plaintiff argues that the ALJ erred in relying on the testimony of the vocational expert because the ALJ said, "In addition, the person is not able to handle high stress work, would not be able to sustain fast paced activity, or work requiring, **let the person meet** strict and explicit production or other quotas, deadlines, schedules, or unusual changes in the work setting." Plaintiff argues that the phrase "let the person meet," must mean that the hypothetical person was able to meet strict and explicit production or other quotas.

44

However, the ALJ found Plaintiff was limited to "no strict or explicit quotas, no deadlines, no schedules, and no unusual work settings." (Tr. at 15). Based on the hypothetical, the expert offered the occupations of production assembler, and hand packager. (Tr. at 53-54). These jobs require production quotas, and for that reason, are in direct conflict with the ALJ's RFC. Id. The expert stated the assembler occupation was a "production" assembler, which by definition, requires quotas. Quotas are inherent in the job description, pursuant to the DOT as follows: "Performs repetitive bench or line assembly operations to mass produce products." The same problem exists with hand packagers.

The ALJ found that plaintiff had the residual functional capacity to perform light work with exceptions and that he "should not be required to . . . tolerate the stress of fast-paced activity, strict and explicit quotas. . . "

Plaintiff's argument that "These jobs require production quotas" is based wholly on plaintiff's own apparent knowledge of the requirements of certain jobs, because there is no legal or vocational basis for this assertion in plaintiff's argument. The Dictionary of Occupational Titles states that a production assembler (706.687-010) "[m]ay tend machines, such as arbor presses or riveting machine, to perform force fitting or fastening operations on assembly line. May be assigned to different work stations as production needs require. May work on line where tasks vary as different model of same article moves along line. May be designated according to part or product produced." This is exactly the description given by the vocational expert in her testimony:

> [The worker] may change work stations, be assigned to different work stations as production needs require. May work on a line with tasks, you know, would vary as it moves along the line. So they may move around. . . .

She also testified that in such a job approximately two hours of the day off and on would be spent sitting and completing paperwork. Therefore, plaintiff's offer of vocational evidence, i.e., that the production assembler and hand packager jobs require strict and explicit quotas, is not grounds for reversing the ALJ's decision when the vocational expert -- who is there to provide expert opinion based on her training and experience -- testifies that those jobs do not

require strict and explicit quotas. Plaintiff's argument that the vocational expert must have misunderstood the ALJ's question because her testimony does not comport with plaintiff's belief of the requirements of those jobs is without basis. There was no objection raised to the qualifications of the vocational expert, and her testimony was in accordance with the Dictionary of Occupational Titles on this issue. Therefore, the ALJ was justified in relying on the vocational expert's testimony in finding plaintiff not disabled. Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); Trenary v. Bowen, 898 F.2d 1361, 1365 (8th Cir. 1990). The ALJ's hypothetical question described someone with the residual functional capacity the ALJ found plaintiff retained, so the vocational expert's testimony that plaintiff could perform other work constitutes substantial evidence supporting the Commissioner's decision. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011); Gragg v. Astrue, 615 F.3d 932, 941 (8th Cir. 2010).

## VII.    PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity because he did not base the residual functional capacity assessment on the opinion of any medical authority. This argument is without merit. I note that plaintiff fails to say exactly which abilities the ALJ erred in finding plaintiff could perform, and he fails to point to any medical authority in the record to support an opposite conclusion.

After careful consideration of the entire record, the ALJ found that plaintiff had the capacity to perform light work, with additional postural, hazard, environmental, and mental limitations. Although a claimant's residual functional capacity is a medical question, it is not based only on "medical" evidence, i.e., evidence from medical reports or sources; rather, an ALJ has the duty to formulate the residual functional capacity based on all the relevant, credible evidence of record. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (the

46

Commissioner must determine a claimant's residual functional capacity based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); 20 C.F.R.§§ 404.1545, 416.945; SSR 96-8p.

The ALJ considered all of the evidence in the rather voluminous administrative record, including hundreds of pages of medical records, in assessing plaintiff's residual functional capacity. The ALJ included a detailed discussion of the many medical records in his written decision. The ALJ is not required to pair up each limitation in the residual functional capacity with the specific evidence supporting this limitation. SSR 96-8p. The ALJ properly considered opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927, and SSRs 96-2p, 96-5p, 96-6p, and 06-3p, and properly articulated the weight assigned to the opinions of plaintiff's treating and consultative doctors. The ALJ gave "little weight" to the opinion of one-time examining physician Dr. Bennoch, because the report was based on a single examination and was internally inconsistent. The ALJ gave "little weight" to the opinion of Dr. Paff, who declared plaintiff "disabled" despite normal straight leg raising tests and near-normal x-rays. Such inconsistencies are an appropriate reasons for discounting weight given to a medical opinion. Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006). Further, a physician's opinion that an individual is "disabled" is entitled to no weight, because it is not a medical opinion; it is an opinion on the application the law, a task reserved to the Commissioner. Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991).

In evaluating the medical evidence, the ALJ gave "greater weight" to the opinion of Dr. Lennard, who based his opinion on a physical examination, diagnostic testing, and a review of other medical reports. The ALJ also discussed at length medical evidence from a number of other clinicians, including Dr. Olive, Dr. Maudlin, Dr. Bharadaraj, Dr. Roark, Dr. Bains, and

Case 6:11-cv-03494-REL   Document 17   Filed 03/29/13   Page 47 of 49

Dr. Shifrin.  Further, the ALJ carefully considered the opinion of Mr. Boyd, dated August 17, 2010, and articulated appropriate reasons for giving it less than controlling weight.  In addition to the reasons cited above, the ALJ pointed out that Mr. Boyd, like Dr. Bains, attributed plaintiff's limitations primarily to perceived pain, not a mental disorder, and treatment notes focus primarily on physical issues, not any mental issues.  The ALJ also found that Mr. Boyd's check-the-box assessment did not include any supporting narrative explanation or reference to clinical findings.  Checklist medical assessment forms are of limited evidentiary value.  Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010).

Plaintiff's argument that Mr. Boyd's second assessment was "new and material evidence that went overlooked by the ALJ [and] warrants remand" is likewise without merit.  Mr. Boyd's second assessment was not before the ALJ at the time of his decision.  In fact, the assessment was completed on July 20, 2011, nearly a month after the ALJ issued his written decision.  The evidence was not material because it did not relate to the period of alleged disability under consideration. 20 C.F.R. §§ 404.970(b), 416.1470(b); Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996); Box v. Shalala, 52 F.3d 168, 171 (8th Cir. 1995).  Plaintiff submitted this "new evidence" to the Appeals Council only.  The text of the Appeals Council's decision makes it clear that it considered this new evidence and found that the ALJ's decision was supported by the record as a whole, including the newly submitted evidence.  In these circumstances, remand for further consideration is inappropriate.  Flynn v. Chater, 107 F.3d 617, 621 (8th Cir. 1997).

Once it is clear that the Appeals Council has considered newly submitted evidence, this Court's role is limited to a review of whether the ALJ's decision is supported by substantial evidence on the record as a whole, including new evidence submitted only to the Appeals Council.  Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007).  In this case, nothing in the

48

new evidence calls into question the ALJ's finding that plaintiff was not disabled from November 14, 2005, through June 24, 2011. The "new evidence" is of limited value because it is on a checklist format, it is unsupported by any explanation or specific clinical findings, and it is inconsistent with Mr. Boyd's treatment notes, which consistently show a GAF in the 60 to 65 range, indicative of only mild to moderate limitations.

Finally, the ALJ limited plaintiff to simple, routine, or repetitive tasks, with no interaction with the public, no close interaction with coworkers, and no fast-paced activity, strict and explicit quotas, deadlines, schedules, or unusual changing work settings which takes into consideration any mental impairment established by the record.

## VIII.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 29, 2013